IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| SCOTT CARL SMITH, <br><br> Plaintiff, <br><br> vs. <br><br> KILOLO KIJAKAZI,[1] <br> Acting Commissioner of Social Security, <br><br> Defendant. | No. 20-CV-53-CJW-KEM <br><br> **REPORT AND RECOMMENDATION** |

Plaintiff Scott Carl Smith seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Smith primarily challenges the finding of the administrative law judge (ALJ) that although Smith was disabled, he would not be disabled if he stopped abusing alcohol and other substances. I recommend **reversing** the Commissioner's decision and remanding for further proceedings.

### I.  *BACKGROUND*[2]

Smith, born in 1959, suffers from a mental-health disorder (most often diagnosed as bipolar or schizoaffective disorder), as well as alcohol- and substance-abuse issues.

---

[1] Kilolo Kijakazi is substituted for her predecessor in accordance with Federal Rule of Civil Procedure 25(d).

[2] The parties have provided a more thorough overview of the treatment records in the Joint Statement of Facts (Doc. 15).

Doc. 15. He was imprisoned from February 2014 to November 2015 after pleading guilty to his third Driving Under the Influence offense. *Id.*; AR 474.[3] Upon his release from prison, he began working full-time as a welder. AR 434, 439, 474.

On December 5, 2016, Smith was involved in a single-vehicle car accident after he had a seizure while driving. AR 565. At the emergency room, providers noted Smith's chart reflected he was prescribed medications for a seizure disorder, but Smith denied suffering any medical conditions or taking any medications. *Id.* At a follow-up psychiatric appointment a few days later, Smith admitted that he had not taken his medications (including for mental health) since February or March 2016. AR 610-11. His family reported Smith was drinking and acting manic. *Id.*

By January 6, 2017, Smith had still not returned to work after the accident, although he wanted to return to work and sought "clearance" from his mental-health providers. AR 612. He filed applications for DI and SSI benefits on January 30, 2017, alleging a disability onset date of December 5, 2016 (the date of the car accident). AR 11.

On February 2, 2017, Smith was hospitalized for five days under a court-ordered commitment, telling providers that he recently "got in trouble for drinking at work and . . . lost his job" and that the police were called when he returned to his former workplace (resulting in the committal). Doc. 15; AR 630-31. Upon discharge on February 7, he remained under commitment to an outpatient treatment program. AR 635-36. On March 10, 2017, Smith returned to his former workplace, arguing with his boss to give him his job back. Doc. 15; AR 639. Once again, his former employer called the police, resulting in Smith's hospitalization in the psychiatric unit from March 10 to March 29, 2017. Doc. 15. His court-ordered commitment changed from outpatient to inpatient, and upon his

---

[3] "AR" refers to the administrative record, filed at Docs. 13-2 to 13-9.

discharge from the hospital, he was transferred to the Cedar Valley Ranch Residential Care Facility. *Id.* Smith remained under commitment and continued to live at Cedar Valley at the time of the ALJ hearing in March 2019. AR 56.

The Social Security Administration denied Smith's DI and SSI applications initially in July 2017 and on reconsideration in December 2017. AR 11. Smith requested review before an ALJ. On March 25, 2019, the ALJ held a video hearing, and Smith; Michelle Stepanek, a staff member at Cedar Valley; and a vocational expert (VE) testified. AR 11, 35-36, 54-55. On April 19, 2019, the ALJ issued a written decision following the familiar five-step process outlined in the regulations[4] to determine whether Smith was entitled to disability benefits. AR 11-27. The ALJ found Smith suffered from the following severe impairments: drug abuse, alcohol abuse, depression, nervous system disorder, and obesity. AR 14. At step three, the ALJ found Smith suffered "marked" limitations in interacting with others and in concentrating, persisting, or maintaining pace; based on this finding, the ALJ found Smith's impairments met Listings 12.04 and 12.08. AR 15-16. The ALJ found, however, that "[i]f [Smith] stopped the substance use," Smith would suffer only moderate limitations in those categories, and therefore, he "would not have an impairment or combination of impairments that meets or medically equals" any of the listings. AR 16-17. The ALJ completed the five-step process, determining that Smith would not be disabled if he stopped abusing substances. Thus,

---

[4] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." ***King v. Astrue***, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. §§ 404.1520(a)(4), 416.920**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." ***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005) (quoting ***Eichelberger v. Barnhart***, 390 F.3d 584, 591 (8th Cir. 2004)).

3

the ALJ concluded that "[b]ecause the substance abuse is a contributing factor material to the determination of disability," Smith was not entitled to disability benefits. AR 26.

Smith appealed, submitting additional records from Cedar Valley. *See* AR 2. The Appeals Council denied Smith's request for review on March 26, 2020 (AR 1-4), making the ALJ's decision the final decision of the Commissioner. *See* **20 C.F.R. §§ 404.981, 416.1481**. The Appeals Council declined to exhibit Smith's newly submitted evidence. AR 2. The Appeals Council noted that some of the records were dated April 20, 2019, through June 24, 2019, after the ALJ issued his decision in this case, and therefore outside the relevant time period. *Id.* Most of the records, however, related to Smith's time at Cedar Valley during the relevant time period, dated from March 2017 to April 19, 2019. *Id.* The Appeals Council found these records did "not show a reasonable probability that [they] would change the outcome of the decision." *Id.*

Smith filed a timely complaint in this court seeking judicial review of the Commissioner's decision (Docs. 1, 3). *See* **20 C.F.R. § 422.210(c)**. The parties briefed the issues (Docs. 16, 19, 22), and the Honorable C.J. Williams, United States District Judge for the Northern District of Iowa, referred this case to me for a report and recommendation.

## II. DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." ***Kirby***, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of

4

those positions represents the [ALJ's] findings, [the court] must affirm the decision." ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

Smith challenges the Appeal Council's failure to admit newly submitted treatment records into evidence. When "it is clear that the Appeals Council . . . considered newly submitted evidence," the court does "not evaluate the Appeals Council's decision to deny review." ***Riley v. Shalala***, 18 F.3d 619, 622 (8th Cir. 1994). Instead, the court determines "whether the [ALJ's] determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made." ***Id.*** Accordingly, in determining whether substantial evidence supports the ALJ's decision, the court will consider the new evidence submitted to the Appeals Council (identifying that this evidence was not before the ALJ).

Smith argues that substantial evidence does not support the ALJ's determination that drugs and alcohol abuse are a contributing factor material to the disability determination. Smith also challenges the weight the ALJ assigned to the medical opinions. Finally, even if the ALJ's materiality determination is correct, Smith argues the ALJ erred by failing to consider whether Smith's impairments would meet or equal the "paragraph C" criteria of the mental-disorder listings (specifically, 12.04) in the absence of substance abuse.

### *A. Materiality*

By statute, "if alcoholism or drug addiction would . . . be a contributing factor material" to the disability determination, the claimant is not entitled to benefits. **42 U.S.C. § 423(d)(2)(C)**; *see also* ***Brueggemann v. Barnhart***, 348 F.3d 689, 693 (8th Cir. 2003). To make the materiality determination, the ALJ must first "determine whether [the claimant] is disabled . . . . using the standard five-step approach . . . without segregating out any effects that might be due to substance use disorders." ***Brueggemann***,

5

348 F.3d at 694. If the ALJ finds a claimant disabled considering all of the claimant's limitations, "including the effects of substance use disorders, . . . then the ALJ must consider which limitations would remain when the effects of the substance use disorders are absent." *Id.* at 694-95.

> [W]hen the claimant is actively abusing alcohol or drugs, this determination will necessarily be hypothetical and therefore more difficult than the same task when the claimant has stopped. Even though the task is difficult, the ALJ must develop a full and fair record and support his conclusion with substantial evidence on this point just as he would on any other.

*Id.* at 695. Although the claimant bears "[t]he burden of proving that [substance use] was not a contributing factor material to the disability determination[,] . . . . [i]f the ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow." *Id*. at 693. In other words, "on the issue of the materiality of [substance use], a tie goes to [the claimant]." *Id.*

Here, considering Smith's substance abuse, the ALJ found Smith's impairments were of listing-level severity because Smith suffered marked limitations in interacting with others and in concentrating, persisting, or maintaining pace. AR 15. But the ALJ found that if Smith stopped abusing drugs and alcohol, he would suffer only moderate limitations in those categories. AR 16-17.

In finding Smith suffered marked limitations (considering his substance abuse), the ALJ noted Smith's altercations with his employer requiring police contact and resulting in his hospitalization. AR 15. During the first of those altercations (on February 2, 2017), Smith reported drinking heavily, and emergency room providers noted he smelled of alcohol; Smith also told providers he had not been taking his medications regularly because of drinking. Doc. 15; AR 627, 630-31. During the second altercation, however (on March 10, 2017), Smith's blood alcohol content (BAC) was

6

zero on admission to the emergency room, and a drug screen was negative (although he reported in the emergency room at 12:29 p.m. that he last drank "this morning"). *See* Doc. 15; AR 638. Emergency-room providers during that second altercation concluded that Smith was having a manic episode, noting he was agitated, uncooperative, hyperverbal, tangential, delusional, and drooling (due to continued talking and excitement). Doc. 15; AR 639. Because he was on an outpatient commitment during the second police encounter, Smith had been receiving an injectable antipsychotic medication, and he was also prescribed Depakote in an oral form. AR 639. Providers noted that Smith had missed his monthly antipsychotic injection the day before. *Id.*

The ALJ also found Smith suffered marked social limitations (considering his alcohol abuse) due to Smith's being "fired from past jobs." AR 15. Smith lost his job as a welder (sometime between December 2017 and February 2018) due to drinking before and during work. *See* AR 610-12, 615, 630-31. While living at Cedar Valley, Smith was also fired from his part-time job in the kitchen as a dishwasher. *See* Doc. 15. Stepanek testified that Smith started working as a dishwasher shortly after he began living at Cedar Valley in late March 2017. AR 60; *see also* AR 789 (progress note from February 2018 stated Smith was a "good worker"). Stepanek testified that Smith usually worked two to four hours a week for one hour at a time (but once worked sixteen hours over two weeks). AR 60-61. She testified at the hearing in late March 2019 that Smith had been fired within the last month and a half because he could not follow instructions, was handling knives in a dangerous manner, and was not running the dishwasher correctly, resulting in improper sanitization. *Id.* Stepanek estimated that Smith needed supervision 50% of the time when performing the dishwashing job (and one to two prompts over the course of the hour), but recently, he needed supervision 100% of the time (resulting in his termination). *Id.* Stepanek testified that the change in Smith's work ability was the result of a hypermanic phase of Smith's bipolar disorder. AR 57, 60-63.

7

The ALJ cited other aspects of Stepanek's testimony in determining Smith suffered marked limitations in interacting with others and concentrating, persisting, or maintaining pace. The ALJ noted Stepanek's testimony about Smith's recent manic phase, including that he went into other people's rooms and stole things, that he left a group activity, and that he smoked in his room (Stepanek also noted Smith had been staying up all night and not sleeping). AR 15, 57-58, 63-65. Stepanek testified that Smith used to understand the rules, but during his manic phase, he was confused and genuinely did not understand what conduct was not allowed. *Id.* Stepanek said that in the last few months, Smith needed "total supervision and prompts" to follow the program. AR 15, 57. She suggested that even once Smith's mental health stabilized, however, he would still need supervision and a structured environment to ensure he took his medications and attended his psychiatry appointments. AR 59-60. The ALJ noted that Stepanek testified Smith gets along with others when managed on his medication and not in a manic state. AR 15, 65.

The record before the ALJ did not include treatment records from Cedar Valley beyond February 2018. It did, however, contain a March 2019 residual functional capacity (RFC) form from Cedar Valley staff (including Dr. Alan Whitters, the Cedar Valley psychiatrist) reflecting that Smith "[wa]s having a dramatic mental state decline" and "[d]isplaying hyper-manic behavior," including using the wrong words, loss of concentration, memory impairment, and being energetic and extremely talkative. AR 813. In addition, the treatment records submitted to the Appeals Council (not before the ALJ) further corroborate Stepanek's testimony about Smith's manic state. On February 11, 2019, Cedar Valley staff observed Smith stumbling and slurring his words, as if "drunk or very over high on something" (Smith did not smell of alcohol). AR 183-84. The next day, staff found cigarettes rolled with marijuana in Smith's room, and on February 14, staff discovered more contraband cigarettes. AR 182-83. On February 15,

Smith was drooling and acting confused, and later that day, he suffered a seizure. AR 181-82. Urine drug testing the next day revealed THC and benzodiazepines, and staff opined Smith likely had drugs stashed that altered and elevated his mood, resulting in his odd behavior the last few days (which had only been observed at night). AR 180-81. On February 17 (the day after the drug test), day staff observed Smith continued to act strangely (elevated moods, erratic and confused behavior, mixing up words) and noted:

> [Smith] came to writer [and] appeared confused. He began to ramble [and] stated he has drank two bottles of vodka then stated "Uh, I mean Gin, no Vodka." [Smith] denied having it here [and] states he should've stuck to beer. States he always drinks beer at home [and] he goes into the garage to do it. [Smith] is mixing up his words [and] appears to be having a decline in his mental health.

AR 179-80. Smith also reported not sleeping and requested medications to help. AR 179. Records for the latter half of February 2019 continue to reflect instances of odd, confused behavior and rule violations (during both day and night). AR 177-79. A note from March 3, 2019, indicates that a staff member observed Smith washing the dishes incorrectly; when he told Smith he would lose his dishwashing job, Smith became agitated and said he would wash the dishes anyway. AR 175. The staff member let Smith finish the dishes under supervision but noted Smith did a number of things wrong. *Id.* The staff member noted, "no drugs since [February 15, 2019, and he s]till couldn't do dishes!" *Id.*; *see also* AR 179 (urine drug screen ordered February 18, 2019). A few staff notes in March 2019 continue to reflect Smith's rule violations and manic behavior, although a note from March 6, 2019, stated Smith had "been much more cooperative" during night shift that week and "easily redirected." AR 174. A treatment record from Dr. Whitters dated March 18, 2019, reflects Smith's "increasing manic behavior," noting Seroquel improved some of his behavior, but he remained confused and extremely talkative (Dr. Whitters adjusted Smith's medication dosages as a result). AR 86.

9

In finding Smith would not be disabled if he stopped abusing drugs and alcohol, the ALJ noted that Smith's substance abuse continued even while living at Cedar Valley under an inpatient commitment. A Cedar Valley treatment record dated May 15, 2017, reflects that after a home visit, Smith "brought marijuana into [Cedar Valley]" and "consumed Robitussin for an illicit purpose."[5] Doc. 15. A June 21, 2017 treatment record notes Smith was positive for drug testing after his last pass. AR 766. The records submitted to the Appeals Council show multiple positive drug tests in May and June 2017: Smith went on an outing on May 6, and staff noted he smelled of marijuana on May 11; Smith went on outings on May 21 and May 27, and both times upon his return, urine tests were positive for THC; Smith went on an outing on June 3, and a drug test later came back positive; and Smith went on an outing on June 17, and his urine test afterward showed THC. AR 199-202; *see also* AR 790 (positive results for barbiturates were determined to be false positives from Smith's prescribed medications). As a result of the positive drug tests, in July, Dr. Whitters denied Smith passes to see his mother, and in August, a drug test came back clean after an overnight visit. AR 765, 790, 793. After a September overnight visit, however, a urine drug test again revealed THC. AR 798; *see also* AR 204. Smith's urine drug tests in November and December 2017 came back negative. AR 789, 792; *see also* AR 205-06. On January 17, 2018, however, a few days after a home visit with his mother, residents complained that Smith smelled of marijuana, and urine drug testing was positive for THC and amphetamines; in addition, a search of Smith's room revealed two empty beer cans, marijuana, and a pipe. AR 794; *see also* 198. The ALJ found that Smith also tested positive for THC and amphetamines

---

[5] The ALJ noted the use of Robitussin was "deemed to have led to an exacerbation of his mental problems," citing a treatment record in which Dr. Whitters noted Smith "was advised to not use any Robitussin DM due to the exacerbation that it has caused presumably over the past week associated with *upper respiratory tract symptoms*." AR 19, 729 (emphasis added).

10

in February 2018, but the treatment note the ALJ relied upon, while from February 2018, discussed the positive drug test from the prior month. *See* AR 18, 66, 789, 791.

The records submitted to the Appeals Council (not before the ALJ) contain additional evidence of Smith's substance abuse. In April 2018, a staff member noted she "thought she detected [the] smell of alcohol" upon Smith's return from a home visit. AR 198. In May 2018, the day after returning from an outing, a Cedar Valley staff member caught Smith smoking marijuana outside, and Smith produced a pipe, stating that was the only contraband he had. AR 197. A few days later, a staff member observed Smith acting suspiciously, and he found marijuana hidden in a planter that Smith had been nearby. AR 195-96. Drug tests in June 2018 and September 2018 were negative, but staff caught Smith with marijuana in July 2018. AR 191, 194-95. In November 2018, after Smith returned from a home visit, staff noticed Smith's room smelled of marijuana. AR 188. Smith attempted to provide old urine for a drug test, and when caught, Smith admitted to using drugs at home and turned over marijuana. *Id.* At the hearing before the ALJ, Stepanek testified that Smith had a negative drug test after going home over the holidays in December 2018. AR 69. And as mentioned, Smith's urine tested positive for THC and benzodiazepines in mid-February 2019, but a staff note from early March 2019 reflected "no drugs" since then.

Although the ALJ correctly noted that Smith has a "history of extensive drug and alcohol abuse" (AR 18), Smith also has a long history of bipolar disorder, *see, e.g.*, AR 610-11. That Smith abused drugs and alcohol throughout the relevant time period is not sufficient evidence that his substance abuse was material to the disability finding. *See* **Social Security Ruling (SSR) 13-2p, 78 Fed. Reg. 11939**, 11941 (Feb. 20, 2013) ("There does not have to be evidence from a period of abstinence for the claimant to meet his or her burden of proving disability."). Here, in finding Smith suffered marked limitations (without excluding evidence related to substance abuse), the ALJ relied on

11

some instances of conduct related to Smith's alcoholism (Smith's termination from the welder job; Smith's police encounter and resulting hospitalization in February 2017). But the ALJ also relied on instances of Smith's behavior while manic. Although Smith was generally drinking heavily at the time of the March 2017 police encounter and hospitalization (and reported last drinking that morning), his BAC was zero on admission to the emergency room, and providers concluded his conduct was the result of a manic episode of his bipolar disorder. The ALJ also relied on Stepanek's testimony about Smith's manic behavior in the months leading up to the hearing. The ALJ seemingly discounted Stepanek's testimony[6] when making the materiality finding, noting generally that she did not mention Smith's drug use until prompted and that Smith's commitment related to both his bipolar disorder and substance abuse. AR 16. But as noted, Smith's drug and alcohol use does not preclude a disability finding. In addition, Stepanek's testimony is supported by the treatment records submitted to the Appeals Council (not before the ALJ), which show Smith's erratic behavior in February and March 2017 continued even after he tested negative for drugs, and ultimately resulted in Smith being fired from the dishwasher job.

    The ALJ did not rely solely on Smith's substance abuse in making the materiality finding. The ALJ also found that "[d]uring time periods when drug screens have been negative, mental status examinations are relatively unremarkable: the claimant has poor insight and judgment, but neutral mood, normal speech, and linear thought process." AR 16. In support, the ALJ cited mental status examinations from November 20, 2017, and January 22, 2018, when Smith was under inpatient commitment and living at Cedar Valley (these mental status examinations also reflect restricted affect). AR 16, 794, 796.

---

[6] For example, the ALJ found it was not clear why Smith lost his dishwashing job, despite Stepanek's testimony on the matter. AR 19.

12

The ALJ also cited treatment records from January and December 2016, prior to Smith's commitment. AR 16, 611, 615. As the ALJ noted, on objective examination, these records reflect stable mood, average intelligence, intact memory, no delusional thinking, and "fairly well organized" thought processes, as well as indicting Smith was alert, oriented, and denied hallucinations and paranoia (and exhibited no manic behavior). *Id.* The ALJ also characterized these treatment records as reflecting Smith had "good" insight, which is inaccurate: "fair" insight was noted in January 2016 and "minimal" insight in December 2016. *Id.*

These treatment records do not support the ALJ's materiality finding. First, although somewhat normal examinations, they are not from a time when Smith was abstaining from substance abuse: prior to his commitment, in 2016, Smith was generally drinking heavily, and the January 2018 treatment note relied upon by the ALJ was dated a few days after Smith tested positive for marijuana and amphetamines and was found with beer cans in his room (Smith did have a negative drug test in November 2017, however). Second, the improvement in Smith's mental health while under inpatient commitment at Cedar Valley could be the result of Smith's increased medication compliance, as staff supervised and ensured he took his medications, rather than the lack of substance abuse.

> Improvement in a co-occurring mental disorder in a highly structured treatment setting, such as a hospital or substance abuse rehabilitation center, may be due at least in part to treatment for the co-occurring mental disorder, not (or not entirely) the cessation of substance use. [The Social Security Administration] may find that [substance abuse] is not material depending on the extent to which the treatment for the co-occurring mental disorder improves the claimant's signs and symptoms. If the evidence in the case record does not demonstrate the separate effects of the treatment for [substance abuse] and for the co-occurring mental disorder[], [the Social Security Administration] will find that [substance abuse] is not material. . . .

13

> [I]npatient intervention is not sufficient to establish that [substance abuse] is material when there is evidence that a claimant has a disabling co-occurring mental disorder[]. [The Social Security Administration] need[s] evidence from outside of such highly structured treatment settings demonstrating that the claimant's co-occurring mental disorder[] has improved, or would improve, with abstinence.

**SSR 13-2p, 78 Fed. Reg. at 11945**.

Here, the ALJ seemed to conflate the materiality substance-abuse inquiry with Smith's medication noncompliance, stating several times that Smith's symptoms improved when he took his medications as prescribed. *See* AR 15-16, 19. But the ALJ did not address why Smith failed to take his medications when not under commitment. The treatment notes consistently reflect that Smith had poor insight into his mental-health and substance-abuse disorders (never "good" insight, as the ALJ found). *See* Doc. 15; AR 86, 611-12, 643, 725, 734, 766, 794, 796, 798; *see also* AR 634, 645, 764, 789-90 (noting "fair" insight, "some" insight, or "better" insight). Several treatment records reflect Smith did not believe he needed medications or to be under commitment. AR 725, 789-90. And Stepanek testified that even once Smith left Cedar Valley, he would be in a twenty-four hour placement home where staff would ensure he took his medications, and "hopefully," "eventually," Smith would be able to take his medications on his own. AR 59. Here, "the evidence overwhelmingly demonstrates [Smith's] noncompliance was attributable to h[is] mental illness." *Pates-Fire v. Astrue*, 564 F.3d 935, 945-46 (8th Cir. 2009) (holding that claimant's medication noncompliance was "a medically-determinable symptom of her mental illness" when she was diagnosed with "schizoaffective or bipolar disorder"—the same impairment as Smith—and the treatment records established the claimant had poor insight into her mental illness); *see also* **20 C.F.R. §§ 404.1530(b), 416.930(b)**; **SSR 82-59**, 1982 WL 31384, at *2-4 (January 1, 1982*)*. The ALJ erred by failing to recognize Smith's medication noncompliance was a

14

Case 1:20-cv-00053-CJW-KEM    Document 25    Filed 08/18/21    Page 14 of 20

symptom of his bipolar disorder, and by failing to parse whether any improvement during inpatient commitment was the result of increased medication compliance, rather than cessation of substance abuse.

The ALJ also supported his materiality finding by pointing to treatment notes from Cedar Valley describing Smith "as a good worker" (at the dishwashing job) and noting "he socializes, although he does keep to his room." AR 16-17; *see also* AR 789-790, 796 (Cedar Valley treatment records relied upon by the ALJ reflect Smith socializes "some but mostly keeps" to himself). The ALJ noted Smith could "keep up with his dishwashing job for some time," watch television, and read. AR 17. The ALJ also noted when Smith originally arrived at Cedar Valley, he followed the rules. *Id*. While this evidence supports that Smith was not always as limited as he was in a manic phase, it tells little of how Smith's drug and alcohol use affected his limitations. As noted, at the time, Smith's medication compliance was improved due to the twenty-four hour structured care setting. And as the ALJ recognized, even in that setting, Smith continued to find ways to abuse substances, "so that it is difficult to distinguish between times when the claimant is under the influence of drugs and times he is not." AR 22.

I recommend finding that substantial evidence does not support the ALJ's finding that Smith's substance-abuse issues were a material factor contributing to the step-three finding that Smith suffered marked limitations in concentration, persistence, or pace, and in interacting with others.

### B. Weight to Medical Opinions

When determining a claimant's RFC, the ALJ considers medical opinions "together with the rest of the relevant evidence." **20 C.F.R. §§ 404.1527(b), 416.927(b)**. For claims filed before March 2017, "[t]he ALJ must give 'controlling weight' to a treating [source's] opinion if it 'is well-supported by medically acceptable

15

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007)); *see also* **20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)**. "Whether the ALJ gives the opinion of a treating [source] great or little weight, the ALJ must give good reasons for doing so." *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016). The ALJ considers the following factors to determine the weight to assign any opinion assessing a claimant's RFC:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current **20 C.F.R. §§ 404.1527(c), 416.927(c)**).

Smith challenges the weight the ALJ assigned to a March 2019 RFC opinion completed by Dr. Whitters and the staff at Cedar Valley. Dr. Whitters indicated Smith was currently undergoing a manic phase and as such, suffered severe limitations. AR 813-20. Dr. Whitters indicated alcohol and substance abuse did not contribute to his opined limitations. AR 820. The ALJ discounted Dr. Whitters's opinion, finding his opinion that "claimant's alcohol and substance abuse d[id] not contribute to any of [Smith's] mental limitations" was "inconsistent with the record as a whole, which contains extensive evidence of substance use." AR 24. But Dr. Whitters did not state Smith's alcohol and substance abuse had no effect on him; rather, when asked if Smith's "alcohol or substance abuse contribute[d] to any of [Smith's] limitations set forth [in Dr. Whitters's opinion] above," Dr. Whitters checked "no." AR 820. Dr. Whitters merely signaled that he completed the RFC form based on the limitations caused by Smith's

16

bipolar disorder, rather than based on limitations caused by Smith's substance abuse. In addition, substantial evidence does not support the ALJ's conclusion that Smith's substance abuse materially contributed to the disability finding, as the court has already discussed.

Because the ALJ's erroneous substance-abuse findings colored his determination of the opinion evidence, the court recommends finding that substantial evidence does not support the ALJ's decision to assign little weight to Dr. Whitters's RFC opinion.

### C. Listing 12.04

Smith argues that the ALJ erred by failing to consider whether in the absence of substance abuse, Smith's impairments met or equaled the "paragraph C" criteria of Listing 12.04 (governing depressive, bipolar, and related disorders). Listing 12.04 requires proof of the "paragraph A" criteria, as well as either the "paragraph B" or "paragraph C" criteria. **20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04**. When considering Smith's substance abuse, the ALJ found Smith's impairments satisfied the paragraph A and paragraph B criteria of Listing 12.04. When excluding Smith's limitations caused by substance abuse, however, the ALJ found Smith did not meet the paragraph B criteria, and the ALJ did not address the paragraph C criteria.

The Commissioner argues that any error is harmless. "Although it is preferable that ALJs address a specific listing," the Eighth Circuit has consistently held that "failure to do so is not reversible error if the record supports the overall conclusion." ***Pepper ex rel. Gardner v. Barnhart***, 342 F.3d 853, 855 (8th Cir. 2003); *accord* ***Vance v. Berryhill***, 860 F.3d 1114, 1118 (8th Cir. 2017); ***Scott ex rel. Scott v. Astrue***, 529 F.3d 818, 822-23 (8th Cir. 2008); ***Karlix v. Barnhart***, 457 F.3d 742, 746-47 (8th Cir. 2006). "[R]emand is appropriate [only] where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit [a court] to conclude that substantial

17

evidence supports the Commissioner's decision." *Scott*, 529 F.3d at 822-23 (holding that remand was required when the record contained factual inconsistencies that the ALJ failed to resolve). Thus, even if the ALJ erred in failing to address the paragraph C criteria of Listing 12.04, remand is not required if the record shows Smith's impairments did not meet or equal the paragraph C criteria in the absence of substance abuse.

Paragraph C of Listing 12.04 requires the following:

> C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder; and
> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life.

**20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04** (citations omitted). The regulations further explain:

> b. The criterion in C1 is satisfied when the evidence shows that you rely, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of your mental disorder. We consider that you receive ongoing medical treatment when the medical evidence establishes that you obtain medical treatment with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for your medical condition. We will consider periods of inconsistent treatment or lack of compliance with treatment that may result from your mental disorder. If the evidence indicates that the inconsistent treatment or lack of compliance is a feature of your mental disorder, and it has led to an exacerbation of your symptoms and signs, we will not use it as evidence to support a finding that you have not received ongoing medical treatment as required by this paragraph.
> c. The criterion in C2 is satisfied when the evidence shows that, despite your diminished symptoms and signs, you have achieved only marginal adjustment. "Marginal adjustment" means that your adaptation to the

18

Case 1:20-cv-00053-CJW-KEM Document 25 Filed 08/18/21 Page 18 of 20

requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports. Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

*Id.* § **12.00(G)(2)(b)-(c)** (citations omitted).

Although the ALJ discussed Smith's medication noncompliance, which is relevant to paragraph (C)(1), the ALJ did not consider whether Smith's lack of compliance was caused by his mental disorder, as discussed above. The ALJ did not make any findings related to paragraph (C)(2), and there is at least some evidence in the record to support that Smith meets or equals paragraph (C)(2)—namely, Dr. Whitters's RFC opinion, which indicates that Smith would be "seriously limited" (11-20% of workday impacted) in responding appropriately to changes in a routine work setting and that Smith has "such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." AR 819. Accordingly, the court cannot say that the ALJ's failure to address paragraph C of Listing 12.04 was harmless error.

I recommend finding that the ALJ committed reversible error by failing to address whether Smith's impairments, in the absence of substance abuse, met or equaled the paragraph C criterion of Listing 12.04.

### III. CONCLUSION

I recommend **reversing** the decision of the Social Security Administration, entering judgment in favor of Smith, and remanding for further proceedings.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. **Fed. R. Civ. P. 72**. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *See **United States v. Wise***, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**ENTERED** this 18th day of August, 2021.

*/s/ Kelly K.E. Mahoney*
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa